FILED

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

2013 APR 30 P 4: 06

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CITY OF PROVIDENCE, RHODE ISLAND, on its own behalf and on behalf of all others similarly situated, | : : : |
| Plaintiff, | : : |
| v. | : : |
| ABBVIE INC., a Delaware corporation, ABBOTT LABORATORIES, an Illinois corporation, BARR PHARMACEUTICALS INC., a Delaware corporation, DURAMED PHARMACEUTICALS INC. (now known as TEVA WOMEN'S HEALTH INC.:, a Delaware corporation, DURAMED PHARMACEUTICALS SALES CORP., a Delaware corporation, TEV A PHARMACEUTICALS USA, INC., a Delaware corporation, and TEV A PHARMACEUTICAL INDUSTRIES LIMITED, an Israeli corporation, | : : : : : : : : : : : : : : : : |
| Defendants. | : : |

CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

CA 13 - 292 ML

C.A. No._____

---

## COMPLAINT AND JURY DEMAND

Plaintiff City of Providence, Rhode Island, individually and on behalf of itself and all others similarly situated, for its Class Action Complaint against Defendants AbbVie Inc. ("AbbVie"), Abbott Laboratories ("Abbott"), Barr Pharmaceuticals Inc. ("Barr"), Duramed Pharmaceuticals Inc. ("Duramed"), Duramed Pharmaceuticals Sales Corp. ("DPSC"), Teva Pharmaceuticals USA, Inc. ("Teva USA"), and Teva Pharmaceuticals Industries Limited ("Teva") (hereinafter "Defendants") alleges based on personal knowledge as to itself, and information and belief upon the investigation of counsel as follows:

## I.   NATURE OF THE ACTION

1.     This is a civil antitrust class action seeking treble damages arising out of Defendants' unlawful exclusion of competition from the market for Niaspan which is an extended-release version of niacin. This action is brought on behalf of all consumers and third party payors (collectively, the "End-Payors") in the United States and its territories who indirectly purchased, paid or provided reimbursement for Niaspan, other than for resale, during the period March 30, 2005 until the effects of the unlawful conduct alleged herein ends. Niaspan is approved as a once-a-day prescription therapy for treating mixed lipid disorders.

2.     Plaintiff alleges that Defendants have engaged in anticompetitive conduct which has caused a less expensive generic version of Niaspan from entering the market in violation of federal and state antitrust laws, state consumer protection laws and state unjust enrichment laws.

3.     In 2001, Defendant Barr filed an Abbreviated New Drug Application ("ANDA") with the U.S. Food & Drug Administration ("FDA") seeking to bring a generic equivalent version of Niaspan to the market.  As the first ANDA filer, Barr, now part of Teva, became entitled to market its generic Niaspan for 180 days free from other generic Niaspan competition.

4.     When Kos received notice of this intention, Kos sued Barr for patent infringement. During the course of the patent infringement litigation and while Barr was prepared to enter the market, Kos and Barr entered into an unlawful arrangement in which Kos agreed to pay Barr millions of dollars over an eight year period if Barr would refrain from competing in the U.S. with an extended release version of Niaspan until September 20, 2013 (the "Pay To Delay Agreement").

5.     The payments, pursuant to the Pay to Delay Agreement, from Kos to Barr were concealed in 2005 under bogus supply and promotion agreements. Additional payments were

made, pursuant to the Pay to Delay Agreement, by Kos in 2006, and 2008. In 2013, payment was made by Kos' successor-in-interest, Defendant AbbieVie, in accordance with the Pay to Delay Agreement.

6.     Defendants also entered into the Pay to Delay Agreement to foreclose generic entry by strategically using Barr's first filer status as a mechanism to block other generic companies from launching their own version of generic Niaspan. This created a "bottleneck" which prevented any other generic Niaspan product from entering the market until 180 days after September 20, 2013. The Pay to Delay Agreement constitutes a restraint of trade under federal and state antitrust laws because it fixed, raised, maintained or stabilized the price of extended-release niacin products at supracompetitive levels that otherwise would not have existed. The Pay To Delay Agreement also allowed Kos and its successor-in-interest to monopolize the Niaspan market.

7.     The ultimate losers of the Pay to Delay Agreement are American consumers who were denied the opportunity to more timely purchase a less expensive generic version and were, thereby, forced to continue to pay unnecessarily high prices for Niaspan for many years.

8.     The Pay to Delay Agreement has prevented a less expensive generic version of Niaspan from entering the market. But for this agreement, a lower priced generic product would have entered the market in 2005 allowing consumers and health insurers to save millions of dollars.

9.     Plaintiff seeks a declaratory judgment that the Pay to Delay Agreement is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff also seeks an injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. Unless enjoined, Defendants' unlawful conduct will continue causing Plaintiff and the Class to sustain injury. Plaintiff also

asserts claims for compensatory and/or treble damages for continuing violations of the state laws as alleged herein.

## II.   JURISDICTION AND VENUE

10.     Jurisdiction over this action is permissible pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than one hundred members of the Class, and at least one member of the putative Class is a citizen of a state different from that of one of the Defendants.

11.     Jurisdiction over this matter is also permissible pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 because Plaintiff brings claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

12.     Defendants are headquartered or transact business in this district making venue under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §1391(b) and (c), appropriate in this District.

## III. PARTIES

13.     Plaintiff City of Providence, Rhode Island ("Providence") is a municipal corporation with a principal address of 25 Dorrance Street, Providence, Rhode Island. Providence is a self-insured health and welfare benefit plan, and provides reimbursement for some or all of the purchase price of prescription drugs including Niaspan. Providence provided reimbursement for some or all of the purchase price of Niaspan for people who reside in and/or purchased Niaspan in California, Florida, Iowa, Massachusetts, New Hampshire, Nevada, and

4

Rhode Island. Providence paid more for Niaspan than it would have absent Defendants' unlawful anticompetitive conduct to prevent generic entry and was injured as a result thereof.

14.     Defendant Abbott is a corporation organized and existing under the laws of the state of Illinois, with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois. Abbott purchased Kos in a tender offer transaction in 2006. On or about on January 1, 2013, Abbott spun off most of its pharmaceuticals operations to AbbVie. At relevant times, Defendant Abbott sold Niaspan and engaged in the conduct challenged in this case and attributed to Abbott, itself and/or through its various employees and/or other agents acting within the course and scope of their duties and/or with actual, apparent, or ostensible authority in connection therewith.

15.     Defendant AbbVie is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois. As of January 1, 2013, Abbott spun off most of its pharmaceuticals operations to AbbVie. At relevant tines, Defendant AbbVie sold Niaspan and engaged in the conduct challenged in this case and attributed to AbbVie, itself and/or through its various employees and/or other agents acting within the course and scope of their duties and/or with actual, apparent, or ostensible authority in connection therewith.

16.     Defendant Barr is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. Prior to 2004, Barr was known as Barr Laboratories, Inc. In 2008, Barr became a wholly-owned subsidiary of Teva. At all relevant times, Defendant Barr engaged in the conduct challenged in this case and attributed to Barr, itself and/or through its various employees and/or other agents

acting within the course and scope of their duties and/or with actual, apparent, or ostensible authority in connection therewith.

17.     Defendant Duramed is a corporation organized under the laws of the state of Delaware, with principal places of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. Until 2008, Duramed was a subsidiary of Barr. In 2008, when Teva purchased Barr, Duramed became a subsidiary of Teva. Duramed is now known as Teva Womens Health Inc. At relevant times, Defendant Duramed engaged in the conduct challenged in this case and attributed to Duramed, itself and/or through its various employees and/or other agents acting within the course and scope of their duties and/or with actual, apparent, or ostensible authority in connection therewith.

18.     Defendant DPSC is a corporation organized under the laws of the state of Delaware, with principal places of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. Until 2008, DPSC was a subsidiary of Barr. In 2008, when Teva purchased Barr, DPSC became a subsidiary of Teva. At relevant times, Defendant DPSC engaged in the conduct challenged in this case and attributed to DPSC, itself and/or through its various employees and/or other agents acting within the course and scope of their duties and/or with actual, apparent, or ostensible authority in connection therewith.

19.     Defendant Teva is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel. Street, P.O. Box 3190, Petach Tikva, Israel. Teva is a leading manufacturer of generic drugs, and it is one of the largest sellers of generic drugs in the United States. Teva purchased Barr in 2008, and Barr is now a wholly-owned subsidiary of Teva. Teva has a facility in this District. At relevant times, Defendant Teva engaged in the conduct challenged in this case and attributed to Teva, itself and/or through its various

employees and/or other agents acting within the course and scope of their duties and/or with actual, apparent, or ostensible authority in connection therewith.

20.     Defendant Teva USA is a Delaware corporation, with its principal place of business at 1090 Horsham Road, P.O. Box 1090, North Wales, Pennsylvania 19454. Teva USA is a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd. Teva USA manufactures and/or distributes generic drugs for sale and us throughout the United States and in this judicial district at the direction, under the control, and for the direct benefit of Defendant Teva. At times relevant herein, Defendant Teva USA engaged in the conduct challenged in this case and attributed to Teva USA, itself and/or through its various employees and/or other agents acting within the course and scope of their duties and/or with actual, apparent, or ostensible authority in connection therewith.

21.     Kos is not named as a Defendant in this action, but participated in the unlawful conduct. Kos was a corporation organized under the laws of the state of Florida, with its principal place of business at 1 Cedar Brook Drive, Cranbury, New Jersey. Kos Life Sciences Inc. was a corporation organized under the laws of the state of Delaware, with its principal place of business at 1 Cedar Brook Drive, Cranbury, New Jersey. Kos Life Sciences Inc. was a wholly-owned subsidiary of Kos.  The Kos entities are collectively referred to as "Kos."

22.     Defendants' actions alleged herein are part of, and in furtherance of, the illegal restraint of trade and were authorized or performed by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' business.

## IV.   LEGAL BACKGROUND

### A.   The Regulatory Structure for Approval of Generic Drugs and Substitution of Generics for Brand Name Drugs

23.   Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers who create a new drug product must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. § 355(a), (b).

24.   When the FDA approves a brand name manufacturer's NDA, the brand manufacturer may list any patents that the brand manufacturer believes could reasonably be asserted against a generic manufacturer who makes, uses, or sells a generic version of the brand name drug prior to the expiration of the listed patents in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations, commonly referred to as the "Orange Book." Patents issued after NDA approval may be listed within 30 days of issuance. 21 U.S.C. §§ 355 (b)(1) & (c)(2).

25.   The FDA relies completely on the brand name manufacturer's truthfulness about patents' validity and applicability; the FDA does not have the resources to check the manufacturer's representations for accuracy or trustworthiness.

#### 1.   The Hatch-Waxman Amendments

26.   The Hatch-Waxman Amendments enacted in 1984 simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A generic manufacturer seeking approval to sell a generic version of a brand name drug may now file an abbreviated new drug application (ANDAs). ANDAs rely on the

scientific findings of safety and effectiveness included in the brand name drug manufacturer's original NDA, but must show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug – that is, that the generic drug is bioequivalent to the brand name drug. The FDA assigns generic drugs that are bioequivalent to branded drugs an "AB" rating.[1]

27.    The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients in the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another. Thus, bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart. 21 U.S.C. § 355(j)(8)(B).

28.    Throughout the Hatch-Waxman Amendments, Congress sought to expedite the entry of legitimate (non-patent infringing) generic competitors, thereby reducing healthcare expenses nationwide. Congress also wanted to protect pharmaceutical companies' incentives to create new and innovative products.

29.    The Hatch-Waxman Amendments achieved both goals, substantially advancing the rate of generic product launches, and ushering in an era of historic high profit margins for brand name pharmaceutical companies. In 1983, pre-Hatch Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic versions available; by 1998, nearly all did. In

---

[1] Generic manufacturers can also seek approval of non-AB-rated generics. The FDCA permits "hybrid" applications that are neither full NDAs containing safety and efficacy data, nor ANDA applications showing that the proposed product is the "same" as the NDA product. 21 U.S.C. § 505(b)(2). Drug products approved under this section use a safe and effective active pharmaceutical ingredient, but modify the drug product in some way so that it differs from the original NDA product, either in dosage form, strength, route of administration, formulation, dosing regimen, or indication. These non-AB-rated generics are not bioequivalent to the innovator product. See 21 CFR 314.54.

1984, prescription drug revenue for branded and generics totaled $21.6 billion and generic drugs accounted for 18.6% of prescriptions. By 2009, total prescription drug revenue had soared to $300 billion and generic drugs accounted for 75% of prescriptions.

## 2.    Paragraph IV Certifications

30.    To obtain FDA approval of an ANDA, a generic manufacturer must certify that the generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book. Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications:

    i.    that no patent for the brand name drug has been filed with the FDA (a "Paragraph I certification");

    ii.    that the patent for the brand name drug has expired (a "Paragraph II certification");

    iii.    that the patent for the brand name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III certification"); or

    iv.    that the patent for the brand name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

31.    If a generic manufacturer files a Paragraph IV certification, a brand name manufacturer has the ability to delay FDA approval of an ANDA simply by suing the ANDA applicant for patent infringement. If the brand name manufacturer initiates a patent infringement action against the generic filer within 45 days of receiving notification of the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. The FDA may grant "tentative approval," but cannot authorize the generic manufacturer to go to market.

32.    As an incentive to spur generic companies to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV

certification gets a period of protection from competition with other generic versions of the drug. For Paragraph IV certifications made prior to December 2003, the first generic applicant is entitled to 180 days of market exclusivity. Meaning, the first approved generic is the only available generic for at least six months.

33.     FDA regulations unintentionally provide incentives for brand name manufacturers to list patents in the Orange Book – even if such patents are not eligible for listing – and sue any generic competitor that files an ANDA with Paragraph IV certifications – even if the competitor's product does not actually infringe the listed patent(s) – in order to delay final FDA approval of an ANDA for up to 30 months.

**B.     The Benefits of Generic Drugs**

34.     Typically, AB-rated generics cost much less than their branded counterparts. Over time, as more generic equivalents compete with each other, prices decline even further. Since passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit pharmacies to substitute AB-rated generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise).

35.     Every link in the prescription drug chain has an incentive to choose less-expensive generic equivalents. As a result of federal reimbursement rules and the industry pricing structure, pharmacies typically earn a higher markup on generics. Private health insurers similarly offer direct incentives to pharmacies to substitute cheaper generic products for more expensive branded ones. Health insurers are contractually obligated to pay for the bulk of their members' prescriptions, whether filled with branded or generic drugs, so offer their members lower copays for generic drugs in order to encourage the use of generics. Members also face the threat of increased health insurance premiums if branded prescription drug costs continue to rise.

36.     Once a generic equivalent hits the market, the generic quickly overtakes sales of the branded drug. More than 90 percent of prescriptions for drugs that are available in both branded and generic forms are filled with a generic. The speed with which generic drugs take over the market appears to be increasing: in a sample of drugs losing patent protection between 1991 and 1993, generics on average held a 44 percent market share after one year; by 2008, generic versions could capture as much as 86 to 97 percent of the market within the first month.

37.     Branded manufacturers are well aware of generics' steady erosion of their previously monopolized market. Branded manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to any (illegal) means possible.

## V.   FACTS

### A.   Niaspan

38.     The active ingredient in Niaspan is Vitamin B-3. Niacin is an organic compound with the formula C6H5NO2 and, depending on the definition used, one of the 40 to 80 essential human nutrients.

39.     In 1955, the *Altschul, R.A. Hoffer et al.*, study[2] described niacin as a lipid lowering property for the first time that was followed by subsequent studies. Niacin is the oldest lipid lowering drug with unique anti-atherosclerotic property. It reduces traditional parameters such as low density lipoprotein cholesterol (LDL or bad cholesterol), very low-density lipoprotein cholesterol (VLDL-C) and triglycerides (TG), but effectively increases high density lipoprotein cholesterol (HDL or good cholesterol). Despite the importance of other cardiovascular risk factors, high HDL correlated to lower cardiovascular event independent of LDL reduction. Other effects include anti-thrombotic and vascular inflammation, improving endothelial function

---

[2] Influence of nicotinic acid on serum cholesterol in man. Arch Biochem Biophys 54(2): 558-559.http://www.ncbi.nlm.nih.gov/pubmed/14350806?dopt=Citation

and plaque stability. Simply put, Niacin significantly reduces the risk of cardiovascular disease and arthrosclerosis progression. Niacin therapeutic effect is mostly through its specific G protein coupled receptor (GPR109A and GPR109B) recently named as hydroxyl carboxylic acid (HCA) receptor 2 that highly expressed in adipose tissue, spleen, immune cells and keratinocytes, but not in other expected organs such as liver, kidney, heart or intestine. The mechanism behind increasing HDL is not totally understood, but it seems to be done in various ways. Niacin increase apolipoprotein A1 levels due to anti catabolic effects resulting in higher reverse cholesterol transport. It also inhibits HDL hepatic uptake, down regulating production of cholesterol ester transfer protein (CETP) gene. Finally, it stimulates ABCA1 transporter in monocytes and macrophages and up regulates peroxisome proliferator-activated receptor γ results in reverse cholesterol transport.

40.     Approximately twenty years ago, Kos began development of a time-release version of Niacin, which it intended to market as a brand name prescription drug. Kos could not claim to have discovered that Niacin reduces cholesterol because that was previously established by the *Altschul* study. Instead, it created a formulation with a favorable release which reduced or avoided various side effects.

41.     Kos could not patent Niacin because it was not novel. However, given Kos's novel release formulation it was able to seek and obtain patents to govern the formulation and method of use for Niaspan. It received the following patents: Patent No. 6,080,428 (the '428 Patent); Patent No, 6,129,930 (the '930 Patent);Patent No, 6,406,715 (the '715 Patent); Patent No. 6,469,035 (the '035 Patent); Patent No. 6,676,967 (the '967 Patent); Patent No. 6,746,691 (the '691 Patent); and Patent No. 6,818,229 (the '229 Patent).  Patent Nos. 5,126,145 and 5,268,181 (the '145 Patent and the '181 Patent) were purchased by Kos.

13

42.     After filing a New Drug Application with the FDA, on July 28, 1997, Kos received approval to market Niaspan for the treatment of mixed lipid disorders. It, thereafter, submitted the '428 Patent, the '930 Patent, the '715 Patent, the '035 Patent, the '967 Patent, the '691 Patent, the '229 Patent). Patent Nos. 5,126,145 and 5,268,181 (the '145 Patent and the '181 Patent) to the FDA for inclusion in the Orange Book.

43.     Niaspan entered the market in September of 1997 with the following three dosages: of 500 mg, 750 mg, and 1000 mg. It quickly became a widely prescribed multi-million dollar product for Kos and its most important product. And given the product's success, Kos was able to raise Niaspan prices while its sales volumes were simultaneously increasing.

### Potential Generic Competition From Barr

44.     In October of 2001, Barr submitted ANDA 76-250 to the FDA seeking approval to market a generic equivalent of the 1000 mg dosage of Niaspan.

45.     On January 15, 2002, Barr filed a Paragraph IV Certification with the FDA stating that: (i) it could manufacture a generic equivalent version of Niaspan without infringing a Kos' patent, (ii) Kos' patents were invalid; and/or (iii) Kos' patents were unenforceable.

46.     Barr was the only company to file such a certification at that time, thereby making Barr the first ANDA filed to whom an exclusive 180-day period to market its generic equivalent of Niaspan was bestowed. This is commonly referred to a "first filer status."

47.     The filing of the Paragraph IV Certification was not warmly received by Kos. In an effort to prevent or delay entry from this threatening competitor, Kos commenced a sham patent infringement action against Barr in the United States District Court for the Southern District of New York, 02-CV-1683(VAM). Kos alleged that Barr's Paragraph IV certification infringed the '428 Patent and the '930 Patent with respect to the 1000 mg dosage of Niaspan. Under the

14

Hatch-Waxman Act, this filing triggered a 30-month stay which prohibited the FDA from granting Barr final approval to launch a generic version of Niaspan.

48.    Kos also filed two additional sham actions in 2002 against Barr in the Southern District of New York. Kos alleged in the first additional sham suit filed on August 13, 2002, 02-CV-6409, that Barr infringed the '428 Patent and '930 Patent by filing ANDA 76-738 with respect to the 500 mg and 750 mg dosages of Niaspan.

49.    In the second sham suit filed on November 12, 2002, 02-CV-8995, Kos alleged that Barr infringed the '715 Patent by submitting a Supplemental Paragraph IV Certification regarding Niaspan.

50.    These staggered sham filings were strategically designed to each trigger a new 30 month stay which would prevent the FDA from granting Barr approval until March of 2005.

51.    Yet another case was filed by Kos, 04-CV1683, on March 26, 2004. In this sham suit, Kos alleged that Barr had infringed the '967 Patent by filing Paragraph IV Certifications with respect to Niaspan.

52.    All four sham litigations were consolidated and Barr filed Counterclaims against Kos seeking a Declaratory Judgment that: (i) Barr's Paragraph IV Certifications did not infringe the '145 Patent, the '181 Patent, the '428 Patent, the '715 Patent and the '930 Patent; and (ii) these patents were invalid or unenforceable. Barr also filed its own action against Kos, 04-CV-7086, requesting a Declaratory Judgment that Barr was not infringing the '691 Patent and/or that the '691 Patent was invalid or otherwise unenforceable. The Honorable Victor Marrero, who presided over all of these lawsuits, did not issue any substantive rulings concerning the validity or enforceability of the patents. He did, however set a trial date for January, 2006.

53.     On or about May 9, 2003, the FDA gave Barr *tentative* approval to come to market with its 1000 mg generic equivalent of Niaspan. The following month, on June 13, 2003, Barr *expected* to receive final approval from the FDA.

54.     In early 2005, Barr was preparing an "at risk" launch – launching its generic equivalent of Niaspan shortly after the 30-month stay expired, but before the patent litigation was resolved. In the Spring of 2005, Barr was ready and willing, and would have been able, to launch its generic equivalent to Niaspan as soon as the FDA issued final approval of Barr's ANDA. Thus, an "at risk" launch would have brought a generic version to the market in the Spring of 2005.

55.     In order to deprive Barr of its 180 days of market exclusivity as the sole generic on the market, Kos prepared to launch an authorized generic version of Niaspan. This would allow it to recapture potential sales lost to generics. In early 2005, Kos manufactured more than $1 million in Niaspan authorized generic inventory so that it was poised to compete with Barr once it entered the market.

56.     To ensure that Barr would not enter the market, Kos applied for a preliminary injunction to prohibit Barr from launching "at risk." A hearing on the application was held on March 18, 2005.

57.     Immediately after the hearing and before a ruling issued, Kos and Barr announced a settlement of their dispute and requested the Court refrain from ruling on the pending injunctive relief application while they papered their deal. A Conditional Order of Discontinuance was issued on March 30, 2005. During this time period, Barr was ready to launch its generic equivalent of Niaspan and had accumulated inventory to fill orders for its generic product once the "at risk" launch occurred.

58.     The patent infringement litigation between Kos and Barr was dismissed on April 12, 2005 after the parties reached the Pay To Delay Agreement: *Kos would make payments to Barr over a period of eight years, and Barr would refrain entering the market with a generic version of Niaspan until September of 2013.*

59.     This agreement was a compromise at the expense of consumers and health insurers because it allowed Kos to maintain its dominant position in the Niaspan market so that it could continue to charge supracompetitive prices while sharing a portion of its monopoly rent with Barr.

60.     Kos and Barr memorialized their anticompetitive arrangement in three agreements: (i) a Settlement and License Agreement; (ii) a Co-Promotion Agreement; and (iii) a License and Manufacturing Agreement.

61.     *The Settlement and License Agreement*: In connection with the settlement of claims in the patent infringement litigation, Kos and Barr entered into a licensing arrangement giving Barr a license to all the Kos patents concerning Niaspan. The license was predicated on Barr's agreement not to bring a Niaspan generic equivalent to market until September 20, 2013.  The license also went beyond the scope of the patent as Kos permitted Barr to launch a generic version of Advicor, which is another cholesterol medication designed to reduce LDL levels, as of September 20, 2013. And conversely, Barr agreed, after launch, to share with Kos a percentage of its profits concerning the sale of generic version of Niaspan and Advicor. There was also an agreement between Kos and Barr that Kos would not license an authorized generic of Niaspan.

62.     *The Co-Promotion Agreement*: Kos agreed to pay Barr, through two of its subsidiaries, a royalty on all Niaspan and Advicor sales during the period that Barr remained out of these markets. Quarterly royalty payments were made to Barr under this agreement. For

example, in 2006 Kos paid Barr over $40m. In 2007, Kos paid Barr an additional $37m under this agreement. Upon information and belief, these payments continued after 2007.

63.    *The License and Manufacturing Agreement*: Kos made an approximately $5m lump sum payment to Barr and agreed to pay Barr additional monies on a quarterly basis so long as Barr stayed out of the Niaspan and Advicor markets.  The lump sum payment was concealed as a payment to compensate Barr for purportedly investing in the ability to manufacture Niaspan under this agreement. Notably, Barr was already capable of entering the market so the compensation provided to it far exceeded any value provided to Kos under this agreement. Quarterly payments were also made to Barr under this agreement on similar fraudulent grounds. Upon information and belief, payments continued under this agreement.

64.    Had Kos and Barr not entered into these unlawful arrangements, a generic version of Niaspan would have entered the market and prices in the market would have been dramatically lower.  Barr could have launched its generic Niaspan at risk as early as April of 2005. Once Barr launched, other generics would have been able to launch their own generic version of Niaspan after the 180 day exclusivity period concluded. Moreover, Kos could have launched an authorized generic version Niaspan in 2005. The Pay To Delay Agreement between Kos and Barr prevented a lower priced generic from entering the market, thereby forcing consumers and insurers to pay higher prices for Niaspan.

65.    Defendants took steps to fraudulently conceal the true nature of these agreements. In 2005, they stated that the effect of the agreement was to bring a generic equivalent of Niaspan to the market in 2013.  They claimed this was four years earlier than the expiration date of the last-expiring Kos Patent. These statements were knowingly misleading because Barr could have launched a generic equivalent of Niaspan, at risk in April of 2005.  The protestations that the

settlement would bring generic equivalents of Niaspan to market sooner than they otherwise would have arrived was plainly fraudulent and designed to deflect attention away from the real purpose and effect of their unlawful Pay To Agreement which was designed to significantly delay generic entry.

66.     Defendants also failed to publicly disclose the Kos payments to Barr in accordance with the Pay To Delay Agreement. For example, when financial analysts requested Defendants to disclose the amounts of the payments or the manners in which they were calculated, the companies refused to provide any information. Kos also failed to file unredacted versions of the contracts with the Securities and Exchange Commission in August 9, 2005.

**Abbott and Teva Join The Pay To Delay Scheme**

67.     In December, 2006 Abbott acquired Kos through a tender offer. In the initial tender offer, Abbott offered to pay Kos shareholders $78 per share. The open market price at the time was $50 per share. The tender offer represented a 56% premium which was dependent on the Niaspan product which remained a very important product at Kos. When Abbott acquired Kos it adhered to the Pay To Delay Agreement and joined the unlawful course of conduct designed to keep Barr from entering the Niaspan market. Given Abbott's market presence, it was able to grow the Niaspan brand from approximately $475m in 2006 to over $1b in 2012.

68.     Similarly, Barr became a wholly owned subsidiary of Teva in December of 2008. Through this deal, Teva acquired the first filer ANDA status of Barr with respect to Niaspan. Like Abbott, Teva also adhered to the Pay To Delay Agreement and joined the unlawful course of conduct designed to keep a generic version of Niaspan from entering the market.

69.     In order to further protect the Niaspan market from generic competition, Abbott commenced similar patent infringement actions against Lupin Limited, Sun Pharmaceuticals, Sandoz, Inc., Cadila Healthcare Ltd., Mylan, Inc., Kremers Urban Pharmaceuticals, Inc., and

Watson Laboratories. The validity or enforceability of the Kos patents was never reached in any of these cases. All of the cases were dismissed by stipulation. While there are four additional patent infringement actions on file concerning the Kos patents, no decision has been reached as to the validity or enforceability of the Kos patents. Thus, Abbott has been able to avoid the entry of any definitive ruling that would disrupt the trigger date for the 180-day exclusivity for Teva. Through delay, and through settlements, Abbott has ensured that no final judgment has been entered on non-infringement, invalidity or unenforceability of the relevant patents.

70.     Last year, Abbott created a new company to manage its prescription drug business known as AbbieVie. As of January of this year, AbbieVie has taken over responsibility for Niaspan. Like Abbott and Teva, AbbieVie adhered to the Pay To Delay Agreement and joined the unlawful course of conduct designed to keep Barr from entering the Niaspan market.

71.     As a result of this on-going course of conduct, no generic equivalent of Niaspan or Advicor is on the market in the United States. AbbVie continues to sell brand name Niaspan and Advicor at artificially inflated prices, and Plaintiff has been denied the lower prices that generic competition would have brought to the market. This lack of generic competition is the direct result of the ongoing unlawful Pay To Delay Agreement that began in 2005, has continued ever since then, and will continue.

72.     Under the Pay To Delay Agreement, in September of this year Teva will begin selling generic Niaspan. As a result of the Pay To Delay Agreement, Teva will likely have to charge higher prices than would have otherwise been charged because Teva has an agreement with AbbVie that both companies will share the profits from Teva's sales of a generic equivalent of Niaspan.

73.     During the four-year period prior to the filing of this Complaint, the Defendants'
unlawful conduct has been ongoing and the Plaintiff has continued to suffer injury every day that
the Defendants' unlawful Pay To Delay Agreement has remained in place. During the applicable
limitations period, the Defendants have operated under an ongoing Pay To Delay Agreement to
suppress generic competition, and Plaintiff has been injured by the Defendants' conduct.

74.     Indeed, Barr's ANDA for a generic equivalent of the 1000 mg dosage of Niaspan
ANDA was in approvable condition as of May 9, 2003 when the FDA issued its Tentative
Approval. Similarly, as of June 13, 2003, Barr's ANDA for a generic equivalent of the 500 mg
and 750 mg dosages of Niaspan received FDA Tentative Approval.

75.     Had it not been for Defendants' anticompetitive misconduct to delay generic
Niaspan competition in the United States, a generic equivalent of Niaspan would have been
available in the United States as early as April of 2005.  And Kos, at or around that time, would
have launched its own authorized generic Niaspan resulting in additional price competition for
generic Niaspan. In the alternative, Kos and Barr would have agreed to a licensed entry date
significantly earlier than September 20, 2013. Accordingly, Plaintiff and members of the Class
would have begun to pay less for their Niaspan years ago and have been injured by being forced
to pay supracompetitive prices for Niaspan.

**Fraudulent Concealment**

76.     Plaintiff and members of the Class had no knowledge of Defendants' unlawful, self-
concealing scheme. They could not have discovered the scheme and conspiracy through the
exercise of reasonable diligence more than four years prior to the filing of this Complaint.

77.     Defendants' conspiracy was self-concealing. Moreover, Defendants employed
deceptive practices and techniques of secrecy to avoid detection of, and to fraudulently conceal,

their contract, combination, conspiracy, and scheme.  Notwithstanding the self-concealing nature

of their conspiracy, Defendants and their coconspirators wrongfully and affirmatively concealed

the existence of their continuing combination and conspiracy from Plaintiff by:

a. Concealing the amounts that Kos was to pay to Barr under the Pay To Delay Agreement;

b. Concealing the fact that those amounts far exceeded any lawful economic benefit that Kos received from Barr under the Pay To Delay Agreement;

c. Issuing a Joint Press Release on April 13, 2005 that claimed the Pay To Delay Agreement was to compensate Barr for promoting Niaspan to obstetricians and gynecologists, and as compensation for Barr agreeing to act as an alternative supplier, when in fact Kos was paying Barr not to launch a generic equivalent of Niaspan;

d. Proclaiming, in the same press release, that the Pay To Delay Agreement would permit Barr to launch a generic equivalent to Niaspan in 2013, which was supposedly "approximately four years earlier than the last-to-expire Kos patent.";

e. Restating false and misleading announcement about the Pay To Delay Agreement in publicly filed documents (including Kos' 10-Q filing dated May 10,2005 at p. 15; Kos' 10-Q filing dated August 9,2005, at p. 24; Kos' 10-Q filing dated November 9, 2005, at p. 25; Kos 10-K filing dated March 10, 2006, at pp. 4, 26; Barr's 10-Q filing dated May 6,2005, at pp. 18-19; and Barr's 10-K filing dated September 13, 2005);

f. Repeating those same false and misleading statements in the Pay To Delay Agreement, Co-Promotion Agreement and Licensing and Manufacturing Agreement. *See* Co-Promotion Agreement 4,; Article 7 of the License and Manufacturing Agreement; and the "Whereas" clauses of the Settlement and License Agreement;

g. During conference calls with investment bank analysts, refusing to answer direct questions from analysts in the financial community who asked about the financial terms of the payments that Kos was making to Barr (including an April 13, 2005 Conference Call, in which Barr's Chief Executive Officer Bruce Downey refused to provide details when asked about the financial terms of the Agreement, and including an August 4, 2005 Conference Call, in which Kos' Interim Chief Financial Officer Juan Rodriguez refused to provide details of those financial terms); and

h. Filing redacted versions of the Agreement with the United States Securities and Exchange Commission (Submitted as Exhibits 10.2, 10.3 and 1OA to Kos' 10-Q

filing dated August 9, 2005), so as to conceal the financial terms of the Agreement.

78.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

79.     As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs and the Class's claims have been tolled.

80.     Alternatively, if the statute of limitations is not tolled, this Complaint alleges a continuing course of conduct (including conduct within the limitations period), and Plaintiff and the members of the Class can recover for damages that they suffered during the limitations period.

## VI. MONOPOLY POWER AND MARKET DEFINITION

81.     At all relevant times, Kos/Abbot/AbbVie had monopoly power over Niaspan because it had the power to maintain the price of Niaspan at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Niaspan.

82.     A small but significant, non-transitory price increase for Niaspan would not have caused a significant loss of sales to other products prescribed and/or used for the same purposes as Niaspan.

83.     Niaspan does not exhibit significant, positive cross-elasticity of demand with respect to price, with any product other than an anticipated AB-rated generic version of Niaspan (which has yet to enter the market).

84.     Because of, among other reasons, its special extended release feature, i.e., as a once-a-day Niacin therapy for treating mixed lipid disorders, Niaspan is different from all products other than an anticipated AB-rated generic version of Niaspan (which has yet to enter the market).

85.     Kos/Abbot/AbbVie needed to control only Niaspan and any AB-rated generic equivalents, and no other products, in order to maintain the price of Niaspan profitably at supracompetitive prices. Only the market entry of a competing, AB-rated generic version of Niaspan would render Kos/Abbot/AbbVie unable to profitably maintain its current prices of Niaspan without losing substantial sales.

86.     Kos/Abbot/AbbVie also sold Niaspan at prices well in excess of marginal costs, and in excess of the competitive price, and enjoyed high profit margins.

87.     Defendants have had, and exercised, the power to exclude competition to Niaspan.

88.     Defendants, at all relevant times, enjoyed high barriers to entry with respect to Niaspan.

89.     To the extent that Plaintiff is legally required to prove monopoly power circumstantially by first defining a relevant product market, Plaintiff alleges that the relevant market is all Niaspan products and AB-rated bioequivalent products (which have yet to enter the market). During the relevant period, Defendants have been able to profitably maintain the price of Niaspan well above competitive levels.

90.     The relevant geographic market is the United States and its territories.

91.     Kos/Abbot/AbbVie's market share in the relevant market is has been and will continue to be 100% until September 20, 2013. For the class period from September 20, 2013 until March of 2014, the Defendants will share a 100% market share in the relevant market.

## VII.  MARKET EFFECTS

92.   Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Niaspan from generic competition.  But for the unlawful Pay to Delay Agreement, Barr would have entered the market with a generic equivalent of Niaspan as early as April of 2005 (when Barr received Final Approval from the FDA to do so), and one or more generic equivalents of Niaspan would have been on the market at all times since then.  Defendants' actions allowed Kos/Abbot/AbbVie to maintain a monopoly and exclude competition in the market for Niaspan, to the detriment of Plaintiffs and all other members of the End-Payor Purchaser Class.

93.   Defendants' exclusionary conduct has delayed generic competition and unlawfully enabled it to sell Niaspan without generic competition. But for Defendants' illegal conduct, Kos/Abbot/AbbVie would have launched an authorized generic in April of 2005, to compete with Barr as soon as Barr launched generic Niaspan.  Other generic manufacturers would have entered the market soon after Barr's 180-day exclusivity period expired, and may have entered as early as the late 2005.

94.   But for the Defendants' illegal conduct, generic competition would have forced down the price of branded Niaspan, and price competition among the generic suppliers would have been strong.

95.   The generic manufacturers seeking to sell generic Niaspan had extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs and marketing generic pharmaceutical products.

96.   Defendants' illegal acts to delay the introduction into the U.S. marketplace of any generic version of Niaspan caused Plaintiff and the Class to pay more than they would have paid for generic Niaspan.

97.     Typically, generic versions of brand-name drugs are initially priced significantly below the corresponding reference listed drug ("RLD") branded counterpart to which they are AB-rated. As a result, upon generic entry, indirect purchasers' of branded drugs are rapidly substituted for generic versions of the drug for some or all of their purchases. As more generic manufacturers enter the market, prices for generic versions of a drug predictably plunge even further because of competition among the generic manufacturers, and, correspondingly, the brand name drug continues to lose even more market share to the generics.

98.     This price competition enables all purchasers of the drugs to: (a) purchase generic versions of a drug at a substantially lower price; and/or (b) purchase the brand name drug at a reduced price. Consequently, brand name drug manufacturers have a keen financial interest in delaying the onset of generic competition, and purchasers experience substantial cost inflation from that delay.

99.     If generic competitors had not been unlawfully prevented from entering the market earlier and competing with Kos/Abbot/AbbVie, indirect purchasers, such as Plaintiff and members of the Class, would have paid less for generic Niaspan by (a) substituting purchases of less-expensive AB-rated generic Niaspan for their purchases of more-expensive branded Niaspan, (b) receiving discounts on their remaining branded Niaspan purchases, and/or (c) purchasing generic Niaspan at lower prices sooner.

100.    Thus, Defendants' unlawful conduct deprived Plaintiff and the Class of the benefits of competition that the antitrust laws were designed to ensure.

## VIII.  ANTITRUST IMPACT

101.    During the relevant period, Plaintiff and members of the Class purchased substantial amounts of Niaspan indirectly from Kos/Abbot/AbbVie. As a result of Defendants'

illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for their Niaspan purchase requirements. Those prices were substantially greater than the prices that members of the Class would have paid absent the illegal conduct alleged herein, because: (i) the price of brand-name Niaspan was artificially inflated by Defendants' illegal conduct; and/or (ii) Class members were deprived of the opportunity to purchase lower-priced generic versions of Niaspan sooner.

102.    As a consequence, Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

103.    General economic theory recognizes that any overcharge at a higher level of distribution in the chain of distribution for Niaspan results in higher prices at every level below. Herbert Hovenkamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624.  Professor Herbert Hovenkamp goes on to state that "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top." He also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

104.    The institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of Niaspan to the Plaintiff and members of the End-Payor Class. Further, the complete foreclosure of generic competition at the Direct Purchaser level similarly injured End-Payors who were equally denied the opportunity to purchase cheaper generic Niaspan bioequivalents.

105. Thus, Defendants' unlawful conduct deprived Plaintiff and the Class of the benefits of competition that the antitrust laws were designed to ensure.

## IX. INTERSTATE AND INTRASTATE COMMERCE

106. Defendants' efforts to restrain competition in the market for Niaspan have substantially affected intrastate, interstate and foreign commerce.

107. At all material times, Kos/Abbot/AbbVie manufactured, promoted, distributed, and sold substantial amounts of Niaspan in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

108. Defendants' anticompetitive conduct has substantial intrastate effects in that, *inter alia*, retailers within each state are foreclosed from offering cheaper generic Niaspan to end payors inside each respective state. The complete foreclosure of generic Niaspan from the market directly impacts and disrupts commerce for end-payors within each state.

109. At all material times, Defendants transmitted funds as well as contracts, invoices and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Niaspan.

## X. CLASS ACTION ALLEGATIONS

110. Plaintiff, on behalf of itself and all End-Payor Class members, seeks damages, measured as overcharges, trebled, against Defendants based on allegations of anticompetitive conduct in the market for Niaspan.

111. Plaintiff brings this action on behalf of itself and, under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), as representatives of the End-Payor Class defined as follows:

> All persons or entities in the United States and its territories who purchased and/or paid for or reimbursed for some or all of the purchase price for Niaspan, in any form, for consumption by themselves, their families, or their members, employees, insureds,

participants, or beneficiaries ("Class"), other than for resale, indirectly from Kos/Abbot/AbbVie at any time during the period March 30, 2005 through and until the anticompetitive effects of defendant's conduct cease (the "Class Period").

The following persons or entities are excluded from the proposed indirect purchaser class:

a.    Defendants and their respective subsidiaries and affiliates;

b.    All governmental entities (except for government funded employee benefit plans);

c.    Insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug purchases;

d.    Fully insured health plans, *i.e.* plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members; and

e.    All judges presiding in this case and all counsel or record.

112.    Members of the Class are so numerous that joinder is impracticable. Plaintiff believes that the Class numbers are in the hundreds of thousands or more. Further, the Class is readily identifiable.

113.    Plaintiff's claims are typical of the claims of the members of the End-Payor Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants, *i.e.*, they paid artificially inflated prices for Niaspan and were deprived of the benefits of competition from cheaper generic versions of Niaspan as a result of Defendants' wrongful conduct.

114.    Plaintiff will fairly and adequately protect and represent the interests of the End-Payor Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the End-Payor Class.

115.    Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation, and with particular experience with class action antitrust litigation involving generic and branded pharmaceutical products.

116.    Questions of law and fact common to the members of the End-Payor Class predominate over questions that may affect only individual Class members because Defendants' have acted on grounds generally applicable to the entire End-Payor Class thereby making overcharge damages with respect to the End-Payor Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

117.    Questions of law and fact common to the End-Payor Class include:

a.      whether Kos/Abbot/AbbVie willfully obtained and/or maintained monopoly power over Niaspan and its anticipated generic equivalents;

b.      whether Kos/Abbot/AbbVie and Bar/Teve/Duramed entered into a contract, combination, and/or conspiracy to restrain trade and, if so, whether it should be evaluated under the rule of *per se* illegality, the "rule of reason," or some other rule or standard;

c.      whether Defendants unlawfully excluded competitors and potential competitors from the market for Niaspan;

d.      whether Defendants' unlawfully delayed or prevented generic manufacturers from coming to market in the United States;

e.      whether the law requires definition of a relevant market when direct proof of monopoly power is available, and if so the definition of the relevant market;

f.      whether Defendants' activities as alleged herein have substantially affected intrastate and interstate commerce;

g.      whether, and if so to what extent, Defendants' conduct caused antitrust injury (*i.e.*, overcharges) to Plaintiff and the members of the Class; and

h.      the quantum of aggregate overcharge damages to the Class.

118.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured

persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

119.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XI.  CLAIMS FOR RELIEF

### COUNT ONE: For Declaratory/Injunctive Relief Under Section One of the Sherman Act

120.    In 2005, Kos and Barr entered into a Pay to Delay Agreement to suppress generic competition for Niaspan, and the Pay to Delay Agreement has continued as an ongoing agreement since then.  Abbott, Teva and AbbVie each joined and continued the unlawful Pay to Delay Agreement to suppress generic competition.  The Pay to Delay Agreement has involved the conduct set forth above. The Pay to Delay Agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

    a.    Allocate all sales of Niaspan in the United States to Kos, Abbott and AbbVie until September 20, 2013;

    b.    Prevent each of the participating companies from selling a generic equivalent or version of Niaspan in the United States until September 20, 2013;

    c.    Prevent other generic manufacturers from selling generic equivalents of Niaspan in the United States until 2014;

    d.    Fix, raise, maintain or stabilize the price that Plaintiff and members of the Class would pay for Niaspan; and

    e.    Fix the price, raise, maintain or stabilize the price that Plaintiff and members of the Class would pay for generic Niaspan when that product is launched on or after September 20, 2013.

121.    The Pay to Delay Agreement has covered a sufficiently substantial percentage of the relevant market to harm competition.

122.    The Pay to Delay Agreement between Defendants is a horizontal market allocation and price fixing agreement between actual and potential competitors and is illegal *per se* under state antitrust laws. Alternatively, this Complaint alleges that the Pay to Delay Agreement is an unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, under a "quick look" or "rule of reason" analysis.   The purpose and effect of the payments flowing from the Pay to Delay Agreement was to delay generic competition.

123.    There is and was no legitimate, non-pretextual, procompetitive business justification for the Pay for Delay Agreement that outweighs its harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve such a purpose.

124.    As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

125.    By engaging in the foregoing conduct, Defendants have violated Section 1 of the Sherman Act.

126.    Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

127.    The goal, purpose and/or effect of the Pay to Delay Agreement was to prevent and/or delay generic competition of Niaspan and enable the Defendants to continue charging supracompetitive prices for Niaspan without a substantial loss of sales.  Such actions allowed the Defendants to share the supracompetitive profits that their unlawful agreement made possible.

128.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's antitrust violations alleged in this Count.  Their injury consists of paying higher prices for Niaspan than they would have paid in the absence of those violations. These injuries will continue unless halted.

129.    The Defendants each committed at least one overt act in furtherance of the conspiracy.

130.    As a direct and proximate result of the Defendants' unlawful restraint of trade, Plaintiff and members of the Class were harmed as described herein.

131.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 18 U.S.C.§ 2201(a), hereby seek a declaratory judgment that the Defendants' conduct as described herein violates Section 1 of the Sherman Act.

132.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anticompetitive conduct does not occur in the future.

133.    Plaintiff has no adequate remedy at law.

**COUNT TWO: For Conspiracy and Combination in Restraint of Trade Under State Law (Against All Defendants)**

134.    In 2005, Kos and Barr entered into a Pay to Delay Agreement to suppress generic competition for Niaspan, and the Pay to Delay Agreement has continued as an ongoing agreement since then.  Abbott, Teva and AbbVie each joined and continued the unlawful Pay to Delay Agreement to suppress generic competition.  The Pay to Delay Agreement has involved the conduct set forth above. The Pay to Delay Agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

    a.    Allocate all sales of Niaspan in the United States to Kos, Abbott and AbbVie until September 20, 2013;

    b.    Prevent each of the participating companies from selling a generic equivalent or version of Niaspan in the United States until September 20, 2013;

    c.     Prevent other generic manufacturers from selling generic equivalents of Niaspan in the United States until 2014;

    d.     Fix, raise, maintain or stabilize the price that Plaintiff and members of the Class would pay for Niaspan; and

    e.     Fix, raise, maintain or stabilize the price that Plaintiff and members of the Class would pay for generic Niaspan when that product is launched on or after September 20, 2013.

135.    The Pay to Delay Agreement has covered a sufficiently substantial percentage of the relevant market to harm competition.

136.    The Pay to Delay Agreement between Defendants is a horizontal market allocation and price fixing agreement between actual and potential competitors and is illegal *per se* under state antitrust laws. Alternatively, this Complaint alleges that the Pay to Delay Agreement is an unreasonable restraint of trade, in violation of state antitrust law, under a "quick look" or "rule of reason" analysis.

137.    There is and was no legitimate, non-pretextual, procompetitive business justification for the Pay for Delay Agreement that outweighs its harmful effect. Even if there were some conceivable such justification, the payment was not necessary to achieve such a purpose.

138.    As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

139.    By engaging in the foregoing conduct, Defendants have violated the following state antitrust laws:

    a.     Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Arizona Rev. Stat. §§ 4-1402, *et seq.*, with respect to purchases of Niaspan in Arizona by members of the Class.

    b.     Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases of Niaspan in California by members of the Class.

c.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of D.C. Code §§ 28-4502, *et seq.*, with respect to purchases of Niaspan in the District of Columbia by members of the Class.

d.   Defendants have intentionally and wrongfully engaged in an unlawful restraint of trade in violation of Fla. Stat. §§ 501. Part II, *et seq.*, with respect to purchases of Niaspan in Florida by members of the Indirect Purchaser Class and this conduct constitutes a predicate act under the Florida Unfair Deceptive Trade Practices Act.

e.   Defendants have intentionally and wrongfully engaged in an unlawful restraint of trade in violation of Hawaii Code §480, *et seq.*, with respect to purchases of Niaspan in Hawaii by members of the Indirect Purchaser Class.

f.   Defendants have intentionally and wrongfully engaged in an unlawful restraint of trade in violation of Iowa Code §553, *et seq.*, with respect to purchases of Niaspan in Iowa by members of the Indirect Purchaser Class.

g.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50- 101, *et seq.*, with respect to purchases of Niaspan in Kansas by members of the Class.

h.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases of Niaspan in Maine by members of the Class.

i.   Defendants have intentionally and wrongfully engaged in an unlawful restraint of trade in the relevant market in violation of Mass. Ann. Laws ch. 93, *et seq.*, with respect to purchases of Niaspan in Massachusetts by members of the Indirect Purchaser Class.

j.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of Niaspan in Michigan by members of the Class.

k.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.51, *et seq.*, with respect to purchases of Niaspan in Minnesota by members of the Class.

l.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75- 21-3, *et seq.*, with respect to purchases of Niaspan in Mississippi by members of the Class.

m.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Mo. Rev. Stat. §§ 416.011, *et seq.*, with respect to purchases of Niaspan in Missouri by members of the Class.

n.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Neb. Code Ann. §§ 59-801, *et seq.,* with respect to purchases of Niaspan in Nebraska by members of the Class.

o.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.,* with respect to purchases of Niaspan in Nevada by members of the Class.

p.  Defendants have intentionally and wrongfully engaged in an unlawful restraint of trade in violation of N. H. Rev. Stat. Ann. §§ 356, 356:2. 356:3, *et seq.,* with respect to purchases of Niaspan in New Hampshire by members of the Indirect Purchaser Class.

q.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57- 1-1, *et seq.,* with respect to purchases of Niaspan in New Mexico by members of the Class.

r.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of New York General Business Law §§ 340, *et seq.,* with respect to purchases of Niaspan in New York by members of the Class.

s.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.,* with respect to purchases of Niaspan in North Carolina by members of the Class.

t.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.D. Cent. Code §§ 51- 08.1-02, *et seq.,* with respect to purchases of Niaspan in North Dakota by members of the Class.

u.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. §§ 37-1-3.1, *et seq.,* with respect to purchases of Niaspan in South Dakota by members of the Class.

v.  Defendants have intentionally and wrongfully engaged in an unlawful restraint of trade in violation of Or. Rev. Stat. §§ 646.705, *et seq.,* with respect to purchases of Niaspan in Oregon by members of the Indirect Purchaser Class.

w.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47- 25-101, *et seq.,* with respect to purchases of Niaspan in Tennessee by members of the Class.

x.  Defendants have intentionally and wrongfully engaged in an unlawful restraint of trade in violation of Utah Code Ann. §§ 76-10-911, *et seq.,* with respect to purchases of Niaspan in Utah by members of the Indirect Purchaser Class.

y.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Vt. Stat. Ann. 9, §§ 2453, *et seq.,* with respect to purchases of Niaspan in Vermont by members of the Class.

z.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trades in violation of W.Va. Code §§ 47-18- 3, *et seq.,* with respect to purchases of Niaspan in West Virginia by members of the Class.

aa.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Wis. Stat. §§ 133.03, *et seq.,* with respect to purchases of Niaspan in Wisconsin by members of the Class.

bb.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of the Puerto Rico Antitrust Act 10 L.P.R.A. §257, *et seq.,* with respect to purchases of Niaspan in Puerto Rico by members of the Class.

140.  Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's antitrust violations alleged in this Count. Their injury consists of paying higher prices for Niaspan than they would have paid in the absence of those violations. This injury is of the type the antitrust and consumer protection laws of the above States and the District of Columbia were designed to prevent and flows from that which makes Defendant's conduct unlawful.

### COUNT THREE: Monopolization Under State Law (Defendants Kos/Abbot/AbbVie)

141.  Plaintiff incorporates by reference the preceding allegations.

142.  Defendant Kos filed one or more sham patent infringement actions. Kos/Abbot/AbbVie also used willful and exclusionary means as part of an overall scheme described herein to improperly maintain and extend its monopoly power in the Niaspan market, as described herein.

143.  At all relevant times, Defendants Kos/Abbot/AbbVie possessed substantial market power in the relevant market, *i.e.,* had 100 percent of the Niaspan market and maintained that position through unlawful conduct. Defendants Kos/Abbot/AbbVie possessed the power to

control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

144. The goal, purpose and effect of Defendant Kos' sham litigations and Defendants Kos/Abbot/AbbVie's scheme was to prevent or delay the entry of AB-rated generic Niaspan which would have sold in the United States at prices significantly below Kos/Abbot/AbbVie's prices for Niaspan, thereby effectively causing the average market price of Niaspan to decline dramatically.

145. The goal, purpose and effect of Defendant Kos' sham litigations and Defendants Kos/Abbot/AbbVie's scheme was to maintain and extend its monopoly power in the Niaspan market. Defendant's illegal scheme enabled Defendant Kos/Abbot/AbbVie to continue charging supra-competitive prices for Niaspan, without a substantial loss of sales, reaping substantial unlawful monopoly profits.

146. Plaintiff and members of the Class purchased substantial amounts of Niaspan indirectly from Kos/Abbot/AbbVie.

147. As a result of Defendant Kos/Abbot/AbbVie's illegal conduct, Plaintiff and members of the Class were compelled to pay, and did pay, more than they would have paid for Niaspan absent Kos/Abbot/AbbVie's illegal conduct.

148. Had manufacturers of generic Niaspan entered the market and lawfully competed with Kos/Abbot/AbbVie in a timely fashion, Plaintiff and members of the Class would have substituted lower-priced generic Niaspan for the higher-priced brand name Niaspan for some or all of their Niaspan requirements, and/or would have paid lower net prices on their remaining Niaspan purchases.

149.    By engaging in the foregoing misconduct, Defendants Kos/Abbot/AbbVie have violated the following state antitrust laws:

a.      Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Arizona Rev. Stat. §§ 44-1402, *et seq.,* with respect to purchases of Niaspan in Arizona by members of the Class.

b.      Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.,* with respect to purchases of Niaspan in California by members of the Class.

c.      Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of D.C. Code §§ 28-4503, *et seq.,* with respect to purchases of Niaspan in the District of Columbia by members of the Class.

d.      Defendants Kos/Abbot/AbbVie have ntentionally and wrongfully maintained its monopoly power in the relevant market in violation of Fla. Stat. §§ 501.201, *et seq.,* with respect to purchases of Niaspan in Florida by members of the Class.

e.      Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Hawaii Code §480, *et seq.,* with respect to purchases of Niaspan in Hawaii by members of the Indirect Purchaser Class.

f.      Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Iowa Code §§ 553, *et seq.,* with respect to purchases of Niaspan in Iowa by members of the Class.

g.      Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Kan. Stat. Ann. §§ 50-101, *et seq.,* with respect to purchases of Niaspan in Kansas by members of the Class.

h.      Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.,* with respect to purchases of Niaspan in Maine by members of the Class.

i.      Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Mass. Ann. Laws. Ch. 93A, *et seq.,* with respect to purchases of Niaspan in Massachusetts by members of the Class.

j.      Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Mich. Comp. Laws Ann.

§§ 445.772, *et seq.,* with respect to purchases of Niaspan in Michigan by members of the Class.

k.   Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, *et seq.,* and Minn. Stat. § 8.31, *et seq.,* with respect to purchases of Niaspan in Minnesota by members of the Class.

l.   Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Miss. Code Ann. §§ 75-21-3, *et seq.,* with respect to purchases of Niaspan in Mississippi by members of the Class.

m.   Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Mo. Rev. Stat. §§ 416.011, *et seq.,* with respect to purchases of Niaspan in Missouri by members of the Class.

n.   Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Neb. Code Ann. §§ 59-802, *et seq.,* with respect to purchases of Niaspan in Nebraska by members of the Class.

o.   Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.,* with respect to purchases of Niaspan in Nevada by members of the Class.

p.   Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of N.H. Rev. State. Ann. §§ 356, 356:2, 356:3, *et seq.,* with respect to purchases of Niaspan in New Hampshire by members of the Class.

q.   Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of N.M. Stat. Ann. §§ 57-1-2, *et seq.,* with respect to purchases of Niaspan in New Mexico by members of the Class.

r.   Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of New York General Business Law §§ 340, *et seq.,* with respect to purchases of Niaspan in New York by members of the Class.

s.   Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-2.1, *et seq.,* with respect to purchases of Niaspan in North Carolina by members of the Class.

t.  Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of N.D. Cent. Code §§ 51-08.1-02, *et seq.,* with respect to purchases of Niaspan in North Dakota by members of the Class.

u.  Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of Niaspan in Oregon by members of the Indirect Purchaser Class.

v.  Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of S.D. Codified Laws Ann. §§ 37-1-3.2, *et seq.,* with respect to purchases of Niaspan in South Dakota by members of the Class.

w.  Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25- 101, *et seq.,* with respect to purchases of Niaspan in Tennessee by members of the Class.

x.  Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-911, *et seq.,* with respect to purchases of Niaspan in Utah by members of the Class.

y.  Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Vt. Stat. Ann. 9, §§ 2453, *et seq.,* with respect to purchases of Niaspan in Vermont by members of the Class.

z.  Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-3, *et seq.,* with respect to purchases of Niaspan in West Virginia by members of the Class.

aa.  Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Wis. Stat. §§ 133.03, *et seq.,* with respect to purchases of Niaspan in Wisconsin by members of the Class.

bb.  Defendants Kos/Abbot/AbbVie have intentionally and wrongfully maintained its monopoly power in the relevant market in violation of the Puerto Rico Antitrust Act 10 L.P.R.A. 263, *et seq.,* with respect to purchases of Niaspan in Puerto Rico by members of the Class.

150.  Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count. Their injury consists of paying higher prices for Niaspan than they would have paid in the absence of those violations.

41

This injury is of the type the antitrust and consumer protection laws of the above States, the District of Columbia and the territories were designed to prevent and flows from that which makes Defendant's conduct unlawful.

### COUNT FOUR: For Unfair And Deceptive Trade Practices Under State Law (all Defendants)

151. Plaintiff incorporates by reference the preceding allegations.

152. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

153. There was a gross disparity between the price that Plaintiff and the Class members paid for the brand product and the value received, given that a much cheaper substitute generic product should have been available.

154. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff and class members were deprived of the opportunity to purchase a generic version of Niaspan and forced to pay higher prices.

155. By engaging in the foregoing conduct, Defendants have violated the following state unfair and deceptive trade practices and consumer fraud laws:

   a.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*

   b.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*

   c.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*

   d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*

   e.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*

42

f.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*

g.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*

h.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, *et seq.*

i.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*

j.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. § 10-1-392, *et seq.*

k.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*

l.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*

m.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*

n.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*

o.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, *et seq.*

p.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, *et seq.*

q.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*

r.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*

s.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*

t.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*

u.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, *et seq.*

43

v.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. § 407.010, *et seq.*

w.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*

x.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*

y.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*

z.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*

aa.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. § 57-12-1, *et seq.*

bb.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349 *et seq.*

cc.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*

dd.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*

ee.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*

ff.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. 15 § 751, *et seq.*

gg.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*

hh.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*

ii.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, *et seq.*

jj.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*

kk.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*

ll.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*

mm.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*

nn.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code § 13-11-1, *et seq.*

oo.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451, *et seq.*

pp.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*

qq.    Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*

rr.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101, *et seq.*

156.    Plaintiff and members of the class members have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable or deceptive acts alleged in this Count. Their injury consists of paying higher prices for Niaspan than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendant's unlawful conduct.

**COUNT FIVE: Unjust Enrichment (all Defendants) (Fifty States & District of Columbia, except Ohio and Indiana, Puerto Rico and the U.S. Territories)**

157.    Plaintiff incorporates by reference the preceding allegations.

158.    Defendants have benefited from the overcharges on their sales of Niaspan resulting from the unlawful and inequitable acts alleged in this Complaint.

159.    Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Niaspan by Plaintiff and members of the Class.

160.    Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

161.    The economic benefit of overcharges and unlawful monopoly profits derived by Defendants through charging supra-competitive and artificially inflated prices for Niaspan is a direct and proximate result of Defendants' unlawful practices.

162.    The financial benefits derived by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Defendants.

163.    It would be inequitable for the Defendants to be permitted to retain any of the overcharges for Niaspan derived from Defendants' unfair and unconscionable methods, acts and trade practices alleged in this Complaint.

164.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by them.

165.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff and the Class.

166.    Plaintiff and the Class have no adequate remedy at law.

## XII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an Order:

167.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(3) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class and declare the Plaintiff the representative of the End-Payor Class;

168.    Enter judgment against Defendants in favor of Plaintiff and the End-Payor Class;

169.    Declare the Defendants' conduct to be in violation of the antitrust and/or deceptive practice statutes in the Indirect Purchaser States;

170.    Grant Plaintiff and the Class equitable relief in the nature of declaratory relief, injunction, disgorgement, restitution, and the creation of a construction trust to remedy Defendants' unjust enrichment;

171.    Grant Plaintiff and the Class damages as permitted by law, including disgorgement;

172.    Award the End-Payor Class damages (i.e., three times overcharges) in an amount to be determined at trial;

173.    Award Plaintiff and the End-Payor Class their costs of suit, including reasonable attorneys' fees as provided by law; and

174.    Grant such other further relief as is necessary to correct for the anticompetitive market effects, caused by Defendants' unlawful conduct, as the Court deems just.

## XIII. JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable.

RESPECTFULLY SUBMITTED,

**THE CITY OF PROVIDENCE**
By its Attorneys,

Jeffrey M. Padwa (#5103)
City Solicitor
Matthew T. Jerzyk (#7945)
Deputy City Solicitor
444 Westminster Street, Suite 220
Providence, RI 02903
(401) 680-5333
(401) 680-5520 Facsimile
Jpadwa@providenceri.com
Mjerzyk@providenceri.com

Michael M. Buchman
(*pro hac vice* to be sought)
POMERANTZ GROSSMAN HUFFORD
     DAHLSTROM & GROSS LLP
600 Third Avenue, 20th Floor
New York, New York, 10016
(212) 661-1100
 (212) 661-8665 Facsimile:
mbuchman@pomlaw.com

Attorneys for Plaintiff

Dated: April 30, 2013